UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JOHN LINDH, )<br>    *Plaintiff*, )<br>)<br>*vs*. )<br>)<br>WARDEN, Federal Correctional Institution, )<br>Terre Haute, Indiana )<br>    *Defendant*. ) | 2:09-cv-00215-JMS-MJD |

## ORDER

Presently before the Court are the parties' cross-motions for summary judgment. [Dkts. 106; 112.] For the reasons set forth herein, the Court **GRANTS in part and DENIES in part** Plaintiff's Summary Judgment Motion, [dkt. 106], and **DENIES** Defendant's Summary Judgment Motion, [dkt. 112].

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish

1

the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

Courts are frequently confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. Cross-motions for summary judgment do not automatically mean that all

questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court considers the parties' respective memoranda and the exhibits attached thereto, and construes all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.
### BACKGROUND

The following facts are not in dispute. Plaintiff John Lindh is a Muslim prisoner currently incarcerated in the Communications Management Unit ("CMU") of the Federal Correctional Complex ("FCC") in Terre Haute, Indiana. [Dkts. 107 at 1; 114 at 10.] Mr. Lindh is serving a 120-month sentence after pleading guilty to (1) supplying services to the Taliban, and (2) carrying an explosive during the commission of a felony which may be prosecuted in the United States.

A tenet of the Islamic faith is five-daily prayers; performing these prayers in a group is either highly preferable or mandatory, depending on the school of Islam to which one adheres. [Dkt. 107 at 6.] Mr. Lindh professes to adhere to a school of Islam that considers group prayer mandatory, [*id.*; dkt. 114 at 31], and he alleges that the Warden's current policy prohibiting group prayer within the CMU substantially burdens his exercise of religion.

**A.  The Communications Management Unit**

The CMU is a self-contained general population unit whose prisoners are placed there because authorities believe these inmates need to have their communications closely monitored.

[Dkts. 107 at 3; 114 at 9.]  Although one might expect a unit of this kind to enforce strict rules regarding the interaction between the prisoners it houses, the prisoners at the CMU are allowed a considerable amount of freedom.  The prisoners are housed in individual cells, but their cell doors are generally kept unlocked.  [*Id*.]  Prisoners are allowed to roam the unit and outside recreation area from 6:00 a.m. until 9:15 p.m. except during times of lockdown, and they may freely converse and engage in recreational activities together.  [Dkts. 46-1 at 6-7; 107 at 3-4; 114 at 9.]  There is a daily lockdown count period both before the cells are opened an at 4:00 p.m. that each take approximately 30-45 minutes, [dkt. 46-1 at 6-7], and an additional count on weekends and holidays at 10:00 a.m., [*id*. at 7].

During the times they are allowed out of their cells, CMU inmates may gather together to talk, snack, play board games, play cards, watch current events on television, exercise, and even play semi-contact sports like basketball.  [Dkts. 46-1 at 8-13; 107 at 3-4.]  They may congregate and discuss anything as long as their behavior is good, they do not cause much noise, and the conversation "doesn't escalate into a confrontation."  [Dkt. 106-1 at 7.]   Throughout the day, they may return to their cells and can have another prisoner in their cell at the same time.  One thing they cannot do: recite the daily Muslim prayers in a group.

**B.     Group Prayer Among Muslim Prisoners at the CMU**

When the CMU first opened in late 2006, Muslim CMU prisoners were able to pray together in the multi-purpose room for the daily prayers that occurred during the periods when prisoners were generally allowed out of their cells.  [Dkts. 107 at 7.]   Although the parties disagree whether these group prayers were "officially authorized" [dkt. 113-1 at 20], under the policy at that time, there is no dispute that the group prayers occurred with the knowledge of CMU officials.  [*Id*; 115 at 22; 115-2 at 5.]

Around May or June 2007, Muslim prisoners other than Mr. Lindh who were praying in the multi-purpose room failed to immediately lock up during a fire emergency. [*Id*.; dkt. 114 at 14.] Although the prisoners were not disciplined for the failure to immediately lock up, they were no longer allowed to pray in the multi-purpose room for the daily prayers. [Dkt. 107 at 7.] Muslim prisoners were allowed one group service each week, the Friday Jumu'ah service, which was held in the multi-purpose room. [*Id*. at 7-8.] Muslim inmates other than Mr. Lindh were also involved in an assault on another Muslim prisoner over what the Warden believes to be a religious dispute.

After the multi-purpose room was no longer available for daily prayer, small groups of prisoners, in view of the CMU staff, would gather together to engage in the daily prayers in various places throughout the unit, including the kitchen area, the large outside recreation area, small outside recreation cages, small indoor recreation rooms, and individual cells. [*Id*. at 8; dkt. 106-2 at 7.] In June 2009, the Warden issued a written memo to the CMU specifying that "[e]xcept for regular Friday Jumu'ah prayer and other special holiday events as prescribed and approved by the Chaplain, inmates are not permitted to participate in group prayer." [*Id*. at 9.] Since the issuance of the memorandum, the prisoners have no longer been able to pray in small groups throughout the CMU. [*Id*.] Currently, Muslim inmates at FCC Terre Haute are permitted to engage in group prayer once weekly during the Friday Jumu'ah prayer. [*Id*.] Daily prayers must be conducted individually from within the cells, and prayer times are announced to facilitate simultaneous prayer. [*Id*.; dkt. 114 at 7.]

**C.     The Plaintiff**

Mr. Lindh was transferred to the CMU in October 2007. [Dkt. 107 at 11.] The Bureau of Prisons has placed Mr. Lindh in the CMU because of the nature of his crime of conviction and

because of his affiliation with terrorist organizations. His placement is not contested. Before arriving at the CMU, Mr. Lindh was disciplined for speaking in a language other than English in violation of special administrative measures then applicable to him, and for placing a chair on a tier, sitting on it, and refusing an order to move it. [Dkts. 106-1 at 3-4; 114 at 10.] In 2006, he was also disciplined for not following an instruction to unfold his pant leg, [dkts. 106-1 at 4; 114 at 10], and for receiving mail through another inmate, [dkts. 106-1 at 4; 114 at 11]. Since arriving at the CMU in 2007, Mr. Lindh has been disciplined twice: first for announcing the "call to prayer" during a morning count, [dkt. 114 at 11], and second for engaging in group prayer in a cell with former-plaintiff Ali Chandia and another Muslim inmate, [*id*; dkt. 107 at 11].

In June 2009, following the issuance of the Warden's memorandum, two Muslim CMU prisoners, Enaam Arnaout and Randall Royer, filed suit against the Warden alleging that the Warden's policy on group prayer violates the Religious Freedom Restoration Act of 1993. A year later, Mr. Lindh joined Mr. Arnaout in filing an Amended Complaint against the Warden. [Dkt. 40.] Following additions and voluntary dismissals of prisoners for lack of standing following their release from prison, Mr. Lindh remains as the sole plaintiff.

As briefing progressed, and as will be discussed in more detail, Mr. Lindh modified the scope of relief he requests. He now seeks the ability to participate in group prayer in the CMU three times daily, and seeks permission only to recite the scripted daily prayer. He does not seek the ability to sermonize or have another sermonize, nor does he request a single-room setting.[1] [Dkt. 115 at 34, 40-41.] Both the Warden and Mr. Lindh now seek summary judgment. [Dkts. 106; 122.]

---

[1] A significant portion of the Warden's evidence addresses the legitimate staffing and security concerns inherent in prisoners conducting group prayer in a single-room setting, here the CMU's multi-purpose room. As Plaintiff has withdrawn that request, the relevance of that evidence has necessarily diminished.

## III.
### DISCUSSION

Mr. Lindh has sued the Warden under the Religious Freedom Restoration Act of 1993 ("RFRA"), which provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of 'general applicability'" unless it demonstrates that "the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." 42 U.S.C. § 2000bb-1. The Court will consider, in turn, whether: (A) group prayer constitutes a religious exercise motivated by Mr. Lindh's sincerely held religious beliefs, (B) the Warden's policy on group prayer creates a substantial burden on Mr. Lindh's exercise of group prayer, (C) the Warden's policy on group prayer furthers a compelling governmental interest, and (D) limiting group prayer is the least restrictive means of furthering that interest.

### A. Does Group Prayer Constitute a Religious Exercise Motivated by Sincerely Held Beliefs?

RFRA states that "the term 'exercise of religion' means "religious exercise, as defined in section 2000cc-5 of this title," 42 U.S.C. § 2000bb-2(4), the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The Seventh Circuit has held that RFRA and RLUIPA apply a common standard, *Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008), and therefore the Court will rely on cases enforcing both Acts in conducting its analysis.

Under RLUIPA, the term "religious exercise" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). The term refers not only to belief and profession but also "the performance of ... physical acts [such as] assembling with others for a worship service." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005). Although RLUIPA does not permit "inquiry into whether a particular belief or practice

7

is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Id.* at 725 n.13 (internal citation omitted).

Here, the Warden concedes that one school of the Islamic faith, the Hanbali school, "requires adult males to perform the prayer in congregation, if possible," [dkt. 113-7 at 17 ¶ 4], and he does not dispute that Mr. Lindh belongs to that school, [dkt. 114 at 31]. Instead, the Warden challenges the sincerity of Mr. Lindh's beliefs in light of Mr. Lindh's apparent concession regarding the Warden's need to maintain prison security during periods of lockdown. [Dkt. 114 at 31-32.] Specifically, the Warden challenges Mr. Lindh's initial assertion that five daily group prayers are "mandatory and not optional," [dkt. 86-1 at 2], as inconsistent with his later acknowledgement that any request for group prayer during periods of lockdown would be "futile," [dkt. 106-2, ¶ 17]. The Warden contends that Mr. Lindh "reverses his prior demand," [dkt. 114 at 31], in claiming that "[t]he inability to engage in daily prayers with other Muslim prisoners during the times [they] are out of our cells is imposing a substantial burden on [his] exercise of religion," [*id* at ¶ 19].

While it is true that inconsistencies in a plaintiff's professed beliefs may be evidence of insincerity, *Koger*, 523 F.3d at 798, the Warden incorrectly characterizes Mr. Lindh's requests as inconsistent. It is undisputed that the Hanbali school mandates group prayer "if possible," [dkt. 113-7 at 17 ¶ 4], and a prison lockdown clearly renders any group activity impossible. Therefore, Mr. Lindh's concession that group prayer is not possible during times of a prison

lockdown does not call into question the sincerity of his beliefs. Instead, it is an appropriate (and welcome) concession that argument otherwise would be meritless.[2]

The Warden also challenges Mr. Lindh's sincerity on the grounds that his beliefs do not align with the Hanbali school because its tenets recognize that security concerns may prevent group prayer. [Dkt. 114 at 35.] The Warden is correct that the Court may look to the tenets of Islam in evaluating Mr. Lindh's sincerity. *See Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) ("[A]lthough sincerity rather than orthodoxy is the touchstone, a prison still is entitled to give some consideration to an organization's tenets."). However, once again the Warden's arguments bear not the issue of sincerity, but rather the issue of whether group prayer is possible within the CMU. What the Warden essentially argues is that, under Islamic law, Mr. Lindh would be excused from performing group prayer if only he would accept that "security concerns do not allow it," [dkt. 114 at 34]. Because the Warden's argument turns on Mr. Lindh's acceptance of the Warden's policy on group prayer, not on his acceptance and adherence to Islamic law, the Warden's challenge to Mr. Lindh's sincerity on the grounds that his beliefs differ from the tenets of Islam is without merit.

The uncontested facts show that the school of Islam to which Mr. Lindh professes to belong mandates daily group prayer whenever possible, and Mr. Lindh has evidenced a consistent adherence to that school. Further, Mr. Lindh rejects the Warden's view that simultaneous prayer in separate cells is adequate. To him, communal prayer requires the

---

[2] The Court praises Kenneth Falk, Mr. Lindh's attorney, for his fair and appropriate concessions throughout the pendency of this case. Indeed, the Court encourages attorneys to concede what must be conceded; concessions such as these are not only a courtesy to the Court, but also legally expected. Part of the attorney's role is to distill cases for the Court and present only the arguments that are actually at issue. By failing to do so, attorneys may be subject to penalty pursuant to 28 U.S.C. § 1927 for unreasonably protracting litigation.

participants to be together where they can see and hear each other. [Dkt. 106-2 at 4.] The importance of that belief will be discussed below.

For the foregoing reasons, the Court finds as a matter of law that daily group prayer is a religious exercise motivated by Mr. Lindh's sincerely held religious beliefs.

### B. Does the Warden's Policy on Group Prayer Create a Substantial Burden on Mr. Lindh's Exercise of Religion?

Mr. Lindh bears the burden of persuasion on the issue of whether the challenged policy "substantially burden[s]" the exercise of his religion. 42 U.S.C. § 2000bb-1(a). While RFRA does not define substantial burden, the same definition of "substantial burden" applies under RFRA, RLUIPA, and the Free Exercise Clause. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814 (8th Cir. 2008). In the context of the Free Exercise Clause, the Supreme Court has held that a government imposes a substantial burden when it "puts substantial pressure on an adherent to modify his behavior and violate his beliefs." *Thomas v. Review Bd.,* 450 U.S. 707, 718 (1981). The Seventh Circuit has recently defined a substantial burden as "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." *Koger*, 523 F.3d at 799 (internal citation omitted).

The Court has determined as a matter of law that Mr. Lindh's sincerely held religious beliefs require that group prayer participants be together and be able to see and hear each other. [Dkt. 106-2 at 4.] Mr. Lindh contends that under the Warden's policy, group prayer is "not only impracticable; it is impossible." [*Id.*] He testified he cannot see or other fellow inmates during the daily prayers. [Dkt. 106-2 at ¶ 23.]

In response, the Warden claims that group prayer is indeed possible because the prisoners are able to pray simultaneously, albeit from within different cells. The Warden also contends that although the prisoners are not allowed to conduct prayers in loud voices, they can hear each

other from their cells. [Dkt. 113-2 at 9.] At oral argument, the Warden claimed that the prisoners are able to hear and see each other from the doorways of their cells, and he contends that group prayer is still possible under his policy because the prisoners may "collectively raise their group voices." [Dkt. 116 at 2.] The evidence submitted by the Warden directly contradicts Mr. Lindh's allegation that the prison's practice of orchestrating simultaneous, individual prayer "is hardly an accommodation when the prisoners ... [are] in individual cells where they cannot see or hear each other, and in fact are forbidden to shout to make themselves heard." [Dkt. 115 at 41, 106-2 at ¶ 23.] In light of this factual dispute, the Court cannot, as a matter of law, conclude in either party's favor. *See* Fed. R. Civ. Pro. 56.

Whether the prisoners are isolated or are able to see and hear each other during prayer is material to determining whether the Warden's policy has rendered Mr. Lindh's exercise of religion "effectively impracticable," *Koger*, 523 F.3d at 799. Neither party submitted photographic, audio or video evidence of the CMU, either during the time of daily prayer or any other time. The descriptions contained in the papers do not permit a determination as to which position is credible. (Indeed such a credibility finding is likely improper when considering motions for summary judgment.) As the Warden has argued, context will matter. [Dkt. 166 at 2.] Thus, the Court finds that a genuine issue of material fact exists concerning whether the Warden's policy on group prayer has substantially burdened Mr. Lindh's religious exercise.

### C. Has the Warden Demonstrated that the Policy on Group Prayer Furthers a Compelling Governmental Interest?

Even if evidence at trial establishes that the Warden's policy on group prayer substantially burdens Mr. Lindh's exercise of religion, the Warden can avoid a violation of RFRA if he can demonstrate that the imposition of this burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. §

2000bb-1(b). To satisfy the first part of his burden under RFRA, the Warden must show not only that he has a compelling governmental interest, but also that his policy actually furthers that interest. *Id.* The Warden has sought to meet that burden by affirmatively moving for summary judgment.

The Warden cites prison security as the compelling interest behind his policy, [dkt. 114 at 15], and it is undisputed that the orderly and safe operations of the CMU is a compelling governmental interest, [dkt. 115 at 31].[3] The legislative history of RFRA demands that courts enforcing the statute give due deference to prison officials on issues of prison discipline. *Mack v. O'Leary*, 80 F.3d 1175, 1190 (7th Cir. 1996) (citing H. Rep. No. 88, 103d Cong., 1st Sess. 8 (1993); S. Rep. No. 11, 103d Cong., 1st Sess. 10, U.S. Code Cong. & Admin. News 1993 p. 1900). *See also Cutter*, 544 U.S. at 723 (noting Congress' intent that courts show "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."). However, the Court must not blindly defer to the Warden's position on matters that implicate prison security, and "to prevail on summary judgment, the Warden 'must do more than merely assert a security concern.'" *Spratt v. Rhode Island Dep't of Corr.,* 482 F.3d 33, 39 (1st Cir. 2007) (quoting *Murphy v. Mo. Dep't. of Corr.,* 372 F.3d 979, 988 (8th Cir. 2004)). *See also Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006) ("[A] court should not rubber stamp or mechanically accept the judgments of prison

---

[3] Mr. Lindh has objected to much of the Warden's evidence on the basis that the Warden's witnesses lack personal knowledge of the matters they attested to, or that the evidence is hearsay. [Dkt. 115 at 7-12.] However, the witnesses have properly testified based on a review of properly authenticated BOP records, which is permissible. In addition, the Court overrules the hearsay objection on the grounds that the Warden is permitted to state the information he is relying upon to justify his policy, a non-hearsay use. Put another way, the information is not being considered as offered for its truth, but rather offered to show the rationale behind the Warden implementing and maintaining the policy against group prayer.

administrators....") (citing *Shimer v. Washington*, 100 F.3d 506, 510) (7th Cir. 1996)). Although the Warden undoubtedly has a compelling interest in maintaining prison security, he still bears the burden of demonstrating that his policy on group prayer serves to further that compelling interest. 42 U.S.C. § 2000bb-1(b).

The Warden has not satisfied that burden here. He has presented multiple academic articles about prison radicalization as evidence that "[i]nmate-led religious services ... threaten the security of the institution as extremist inmates could use the religious services to radicalize and recruit other inmates," and he contends that his policy on group prayer was developed because of this and other security concerns. [Dkt. 116 at 14.] But the evidence that he submitted is not one-sided. The Court notes that these articles also establish that religious participation can promote positive behavior among prisoners and aid in the rehabilitation process. [*See* dkt. 113-11 at 5; 113-12 at 4, 6, 10.] None of the articles describes how rote recitation of a scripted prayer leads to radicalization.

In addition to concerns about radicalization, the Warden points to Mr. Lindh's disciplinary history in limiting Mr. Lindh's exercise of group prayer. [Dkt. 114 at 10.] And of course, the Warden has a compelling interest in controlling prisoner conduct and limiting a prisoner's misbehavior. But the evidence before the Court shows that Mr. Lindh has been free of disciplinary write-ups since July 21, 2010. [Dkt. 113-3 at 64.] His last conduct violation was for his attempt to participate in group prayer in violation of the policy at issue here. [*Id.*] The Warden rightly characterizes such conduct as an act of defiance and challenge to his authority. [Dkt. 113-2 at 6.] But if the Warden is exercising that authority in violation of RFRA, the challenge can be considered less troublesome. And time is passing and Mr. Lindh is behaving, thus casting doubt on the compelling interest in prohibiting him from daily group prayer

permanently. Moreover, the most recent misconduct postdates the policy; it cannot have served as a basis for implementing it.

The Warden also seeks to justify enforcing the policy against Mr. Lindh taking into account "not only [Mr. Lindh's] specific circumstances, but also those of the other CMU inmates and the unit as a whole." [Dkt. 114 at 11.] The Warden's admission places at issue the disciplinary histories of all other Muslims in the CMU, despite the Warden's successful opposition to Mr. Lindh's motion to obtain class certification in this matter. [Dkts. 45; 67.] The continued validity of this concern is questionable given that most of the inmates for whom specific disciplinary incidents are cited are no longer in the CMU, [*see* dkt. 110], and given the evidence that daily group prayer occurred within the CMU's common areas without incident in the period between the closing of the multi-purpose room and the implementation of the policy, [dkts. 113-1 at 20; 106-2 at 2; 106-4 at 2; 106-5 at 2].

Setting aside the question of the extent to which Mr. Lindh's exercise of religion may be burdened as a result of other Muslim inmates' conduct, the Court recognizes that Mr. Lindh cannot engage in group prayer by himself. Other Muslims in the CMU need be permitted to join him in prayer, regardless of whether they have been able to join him in this suit. However, even in light of the criminal histories and general past behavior[4] of Muslim inmates at the CMU, [*see* dkt. 114 at 14-15], the Court cannot conclude that the Warden's permanent blanket policy, which

---

[4] The Warden points out that "from November 2009 through November 2010, 13 of the 17 disruptive incidents in the CMU were perpetrated by Muslim inmates," but that "[d]uring the pendency of this lawsuit, however, the number of disciplinary incidents by [Mr. Lindh] and other CMU Muslim inmates has significantly decreased." [Dkt. 114 at 17.] While the Warden apparently seeks the inference that their good behavior is calculated to achieve success in the present action, and that therefore the Court should at least disregard it, or better yet actually view it as negative behavior, the Warden is not entitled to such an inference when moving for summary judgment. *Celotex*, 477 U.S. at 330.

does not take individual prison behavior into account, furthers a compelling governmental interest.

The Warden has neglected the second half of his burden on the issue of compelling interest; he has not established as a matter of law that his policy on group prayer actually serves to further prison security. Specifically, the Warden has not demonstrated the nexus between prohibiting group recitation of rote, scripted prayers – which feature no additional conversation or sermon – and maintaining security in a unit where prisoners are otherwise free to gather, converse and engage in myriad activities.

The Warden's burden here is more than a nominal one,[5] and he cannot prevail on summary judgment by merely invoking the deferential standard and asserting security concerns. *See O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) ("RFRA does not allow governments to defeat claims so easily. A governmental body ... must *demonstrate*, not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest."). Because the Warden bears the ultimate burden of persuasion at trial on this issue, to prevail on summary judgment, he must show that "the evidence is so powerful that no reasonable jury would be free to disbelieve it." *See* MOORE'S FED. PRACTICE 3d, § 56.13[1]. He has not done so here. Based on this record, and in light of the freedom of activity and conversation otherwise enjoyed by prisoners at the CMU, a reasonable jury could disbelieve that the Warden's

---

[5] Mr. Lindh has not challenged the constitutionality of the Warden's policy, under which challenge the Warden might only be subject to rational-basis scrutiny for his facially neutral policy. *See Locke v. Davey*, 540 U.S. 712, 721 (2004) (applying rational-basis scrutiny to a rule facially neutral with respect to religion). Because Mr. Lindh's claim is brought under RFRA, the Warden must meet the much higher standard proving his policy furthers a compelling governmental interest. RFRA was explicitly enacted "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise is substantially burdened." 42 U.S.C. § 2000bb(b)(1). Thus, the Warden's repeated citation to free exercise cases applying the lesser standard is somewhat misplaced.

policy on group prayer furthers the compelling governmental interest of prison security. Summary judgment on this issue is therefore inappropriate.

### D. Is Limiting Group Prayer the Least Restrictive Means of Achieving the Compelling Governmental Interest?

Even if the Warden can establish that the CMU's security concerns amount to a compelling governmental interest, he would also have to demonstrate that prohibiting daily group prayer is the least restrictive means of furthering that interest, should his policy be deemed a substantial burden on Mr. Lindh's exercise of religion. 42 U.S.C. § 2000bb-1(b)(2). To do so, the Warden must show that he could not protect his compelling interest by some less restrictive means. *Mack v. O'Leary*, 80 F.3d 1175, 1180 (7th Cir. 1996). *See Shakur v. Schirro*, 514 F.3d 878, 890 (9th Cir. 2008) ("[A] prison cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.") (internal citation omitted).

In arguing that the existing policy is the least restrictive measure to further prison security, the Warden elaborates on the pragmatism behind requiring the prisoners to pray in their individual cells, for example, that it "does not require the constant staff supervision like group prayers do," and that "in the event of an emergency, officers can just close the doors and account for, and secure, the inmates in their cells," [dkt. 114 at 23]. Nonetheless, he fails to demonstrate that any less restrictive alternatives would be feasible or were actually considered. Dismissing as "an irrelevant distraction," [dkt. 116 at 17], Mr. Lindh's argument that other prisons within the BOP have managed to accommodate daily group prayer, the Warden never demonstrates to the Court why allowing group prayer is feasible at other institutions but not at the CMU. Instead, the Warden offers little more than conclusory statements from CMU officials that the current

policy on group prayer is the least restrictive means of achieving prison security. [*See* dkts. 113-2 at 17; 113-5 at 36.]

Characterizing Mr. Lindh's prior request for single-room assembly as an "all-or-nothing" demand, [dkt. 114 at 58], the Warden relies on an Eight Circuit case in arguing that Mr. Lindh's "case presents 'the unusual situation where the government has satisfied the least restrictive means prong by demonstrating that other less restrictive alternatives are not acceptable to plaintiff.' *Fowler v. Crawford*, 534 F.3d 931, 938 (8th Cir. 2008)." [Dkt. 114 at 58-59.] His reliance is misplaced. The Warden is not relieved from considering other, less restrictive alternatives. Mr. Lindh's case is distinguishable from *Fowler*,[6] where the plaintiff was unwilling to accept anything but a full sweat lodge, 534 F.3d at 938, because Mr. Lindh "would be willing to pray with other prisoners in other areas of the unit as [they] did for years." [Dkt. 106-2 at ¶ 26.] As Mr. Lindh specifically points out, "[a]llowing these prayers by small groups of prisoners is an alternative that the Warden has not considered." [Dkt. 115 at 41.] Indeed, the Warden has introduced no evidence that he has actually considered – as RFRA and BOP policy require – any less restrictive means. [Dkt. 113-2 at 21.] The Warden has rejected single-room assembly in the multi-purpose room, and embraced separate simultaneous prayer within the cell. No evidence of consideration of other measures in between has been presented, including consideration of the alternatives suggested by Mr. Lindh, who bears no burden on this issue. Where a record is so deficient, the case remains viable. *Miles v. Moore*, 2011 U.S. App. LEXIS 21193 (4th Cir. 2011).

Given the procedural posture, the Court must give Mr. Lindh the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine

---

[6] *Fowler* is also distinguishable because it is a constitutional challenge, not an action under RFRA.

17

issue for trial . . . against the [Warden]." *Celotex*, 477 U.S. at 330. Therefore, although the Warden has the compelling interest of maintaining prison security, genuine issues of material fact exist about whether the current policy furthers that interest, or whether the Warden's policy on group prayer is the least restrictive means of furthering it. On this evidentiary record, the Court cannot conclude as a matter of law that the Warden's policy on group prayer is consistent with RFRA.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Mr. Lindh's Motion for Summary Judgment, [dkt. 106], and **DENIES** the Warden's Cross-Motion for Summary Judgment, [dkt. 112]. The Court finds as a matter of law that recitation of the five daily Muslim group prayers is a religious exercise rooted in Mr. Lindh's sincerely held religious beliefs. However, genuine issues of material fact exist regarding whether the Warden has substantially burdened Mr. Lindh's exercise of religion. And the Warden has not satisfied his burden of showing either that the policy on group prayer is in furtherance of the compelling governmental interest of prison security, or that he has used the least restrictive means to further the government's interest.

02/03/2012

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

William Lance McCoskey
UNITED STATES ATTORNEY'S OFFICE
william.mccoskey@usdoj.gov