UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOHN LINDH, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:09-cv-00215-JMS-MJD |
| | ) | |
| WARDEN, Federal Correctional Institution, | ) | |
| Terre Haute, Indiana, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 27, 2012, through August 30, 2012, the Court conducted a bench trial in this action. Plaintiff John Walker Lindh was present in person and via teleconference and by counsel Kenneth Falk and Gavin Rose. Defendant Warden was present in person and by counsel Thomas Kieper and William Lance McCoskey.

John Walker Lindh is well known as the "American Taliban" who pled guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony; however, his prison record paints a different portrait. His scant, nonviolent disciplinary history during his incarceration has merited him a classification of low security. He is allowed to engage in contact sports, play cards, and watch movies and television, including Muslim videos in the Arabic language. In this matter, he seeks permission to engage in one more activity: congregate prayer in accordance with his sincerely held religious beliefs.

Mr. Lindh has brought this action under the Religious Freedom Restoration Act of 1993 ("RFRA"), which was explicitly enacted "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."

1

42 U.S.C. § 2000bb(b)(1). The statute reflects Congress' concern about the United States Supreme Court's holdings in *Employment Division v. Smith*, 494 U.S. 872 (1990), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), both of which, in Congress' estimation, weakened traditional First Amendment protections. S. Rep. 103-11, 1993 U.S.C.C.A.N 1892, 1895-1901. Because Congress thought that *Smith* and *Lone* gave prison wardens a level of discretion that Congress thought was too restrictive on prisoners' rights, Congress through RFRA therefore holds the Warden to a higher standard than would be required by a constitutional claim.

The Court now enters its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such. Finally, the Court recognizes that there was conflicting testimony on several issues presented at trial. The Court considered all of the evidence presented by the parties in arriving at its findings of fact, and its findings reflect the testimony that the Court credited.

## I.
### FINDINGS OF FACT

The parties stipulated to the following facts:

1.      The Communications Management Unit ("CMU") is a self-contained population housing unit within the Federal Correctional Institution at the Federal Correctional Complex in Terre Haute, Indiana ("FCI Terre Haute" and "FCC Terre Haute," respectively).

2.      The CMU was established to house inmates whose communication with persons inside and outside Bureau of Prisons ("BOP") facilities the Government has determined must be monitored closely to ensure the safety, security, and orderly operation of BOP facilities and the

protection of the general public.  Inmates are assigned to the CMU based on the offenses for which they have been convicted, their offense behavior, and other verifiable information.

3.      As a self-contained unit, all meals, religious services, and educational, recreational, vocational, and administrative programming and activities for the CMU inmates takes place inside the unit.

4.      There are 55 cells in the CMU.

5.      Although the cells could hold two inmates each, inmates currently are housed one-to-a-cell, and there are no plans to assign multiple inmates to a cell.  This arrangement is always subject to change at the discretion of the Warden based on the population of the unit and his judgment as to how best to achieve the Government's compelling interest in maintaining the safety, security, and orderly operation of FCC Terre Haute.

6.      The cells contain, among other things, a bed and toilet/sink unit.

7.      Five cells within the CMU, referred to as the Special Housing Unit ("SHU"), are reserved for short-term administrative and disciplinary segregation.  Inmates assigned to the SHU are restricted to their cells and do not enjoy freedom of movement within the CMU.

8.      Inmates in the CMU are subject to the same restrictions applied to inmates in all other general population housing units.  All incoming and outgoing mail, except legal mail, is inspected before inmates may read it or send it out.

9.      Inmates in the CMU are subject to additional restrictions unique to the CMU based on its unique mission and purpose.

        a.  For example, except for communications with their attorneys, all inmates' phone calls and conversations with visitors and other inmates are monitored.

b.  As an additional example, all areas of the CMU are subject to constant audio surveillance.

10.     In all general population housing units, including the CMU, inmates are free to move within the unit except when confined to the SHU or ordered to lock down by BOP staff.

11.     In all general population housing units, including the CMU, prisoners are allowed out of their cells from 6:00 A.M. until 9:15 P.M. except when confined to the SHU or ordered to lock down by BOP staff for counts or other administrative or safety reasons.

12.     The count takes approximately 30-45 minutes.

13.     In all general population housing units, including the CMU, when inmates are out of their cells, they are free to go to various areas within the unit.  In the CMU, these areas include a lounge area with multiple televisions; a food service area with tables, microwave, and drink dispenser that can be accessed at any time; multi-purpose rooms with a washer and dryer that can be used for personal laundry; a room where emails can be sent and received, as well as legal research conducted; rooms with exercise equipment; and an outdoor recreation area containing a basketball court and smaller recreation enclosures.  With the exception of food services, similar facilities are included in all general population housing units.

14.     In all general population housing units, including the CMU, inmates who are not confined to the SHU or ordered to lock down may gather outside their cells to talk, snack, play board games or cards, watch television, exercise, and play sports.

15.     In all general population housing units, including the CMU, inmates who are not confined to the SHU or ordered to lock down are allowed to congregate and discuss anything as

long as their behavior is good, they do not make too much noise, and the conversation does not escalate into a confrontation.

16.     In all general population housing units, including the CMU, inmates are allowed to return to their cells during the day.

17.     There are cameras and listening devices throughout the CMU.  Some of these devices are visible to the inmates, and some are not.

18.     The BOP's policy concerning religious practices is articulated in BOP Policy Statement 5360.09 ("PS 5360.09"), which was implemented on December 31, 2004.

19.     Congregate religious services in the CMU take place in a multi-purpose room, which has a mesh door and mesh barrier between it and the hallway so the activities inside can be seen and heard from outside the room.

20.     The multi-purpose room is used for educational and recreational programming and other approved group activities in addition to five weekly religious services.

21.     Activities authorized for group activities are specifically identified on the schedule for the multi-purpose room and the Schedule of Religious Activities.

22.     As of June 27, 2012, 23 of the 43 inmates in the CMU were Muslim.

23.     A central tenet of the Islamic faith is the obligation for adult Muslims to engage in five daily prayers, or *Salat*.

24.     The Koran commands that these prayers be held at dawn (*Fajr*), early afternoon (*Dhur*), in the late afternoon (*Asr*), at post-sunset (*Maghrib*), and in the evening (*Isha*).  The Koran does not command that these prayers be held at a specific time, but within a prescribed range of times based on the sun's ascent and descent.

25.     Depending on the school of Islam to which an adherent belongs, making these prayers in congregation, if possible, is either considered to be theologically preferable or required.

26.     Mr. Lindh claims to be an adherent to the Hanbali school of Islam, and believes that congregation for all five daily prayers is mandatory, not optional.  Therefore, Mr. Lindh wishes to perform the *Salat* prayers in congregation with his fellow Muslim inmates.  The *Salat* prayers are each of short duration and feature a prescribed sequence of bowing, prostration, sitting, and reciting formulaic verses in Arabic.

27.     Although the prescribed range of times for each daily prayer varies from day to day based on the sun's ascent and descent, the earliest *Salat* prayer may take place before inmates are allowed out of their cells in the morning, and the latest prayer may take place after inmates are confined to their cells in the evening.

28.     Mr. Lindh concedes that security concerns may restrict congregate prayer activities, and concedes that congregating to perform *Salat* prayers prescribed to take place during times inmates are confined to their cells is futile even though he believes that congregation is mandatory, not optional, because of security concerns during times when inmates are otherwise locked down.  Mr. Lindh nevertheless wishes to perform all other *Salat* prayers in congregation with other Muslims inmates.

29.     In May 2007, BOP staff initiated an institution-wide lockdown at FCI Terre Haute due to a fire emergency.  In the CMU, the unit officer found sixteen Muslim inmates performing unauthorized congregate *Salat* prayers in the multi-purpose room.

30.     The multi-purpose room continues to host authorized congregate religious services once per week for Muslims and other religious faiths represented in the CMU, consistent with BOP policy.

31.     At least nine religions are represented in the CMU population.  Five have requested accommodation and hold authorized weekly congregate services in the multi-purpose room.

32.     For Muslim inmates in the CMU, the authorized congregate prayer in the multi-purpose room is the Friday *Jumu'ah* service.

33.     The *Jumu'ah* service lasts longer than the daily prayers and features, in addition to formulaic verses recited in Arabic, a sermon.

34.     At the current time, a contract Imam is present for the authorized *Jumu'ah* service approximately once per month.  The authorized *Jumu'ah* service is led by inmates who rotate responsibility for leading the service, under the supervision of staff or the contract Imam.

35.     During the 2009 Ramadan holy month, the Warden exercised his discretion under BOP policy to allow Muslim inmates access to the multi-purpose room for three of the five daily prayers.

36.     During the 2010, 2011, and 2012 Ramadan holy months, the Warden has exercised his discretion under BOP policy to allow Muslim inmates to meet in the multi-purpose room for one of the daily prayers.

37.     The Ramadan prayers are led by the inmates.

38.     In June and August of 2009, the Wardens of FCI Terre Haute issued memoranda specifically advising the CMU inmates of the CMU policy for religious activities.

39.     All inmates in the CMU may pray at any time in their individual cells.

40.     An updated schedule displaying the prescribed range of times for each day's *Salat* prayers is constantly posted in the CMU and is visible to all inmates so Muslim inmates can know when to perform their prayers each day.   This schedule is obtained from www.Islamicfinder.org.

41.     As with any other activity performed in the institution, inmates who pray in their cells must do so in a manner that does not disrupt the safety, security, or orderly operation of the institution.

42.     Mr. Lindh pled guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony.   He was sentenced to 120 months imprisonment and three years of supervised release.

43.     Mr. Lindh entered into the custody of the Bureau of Prisons in 2003.   He is projected to be released in 2019.

44.     In October of 2007, Mr. Lindh was confined to the CMU and has been there since that time.

45.     There are five security levels assigned to inmates within the Bureau of Prisons: minimum, low, medium, high, and administrative.   The CMU is an Administrative unit and is authorized by policy to house inmates of all security classifications.

46.     Upon Mr. Lindh's arrival at the CMU, he was assigned a security classification of "high," which he held from 2007 until October 1, 2008, when he received his current classification of "low" security.

47.     Mr. Lindh has committed the following disciplinary infractions since his arrival in the Bureau of Prisons:

    a.  In 2003, Mr. Lindh spoke Arabic with another inmate in violation of a special administrative measure (SAM) (now lapsed) that prohibited him from communicating in any language other than English.

    b.  In 2006, Mr. Lindh was disciplined for refusing an order by placing a chair on a tier and sitting on it after having been ordered not to do so by BOP staff.

    c.  Also in 2006, Mr. Lindh was disciplined for ignoring an order to unfold his pants leg because he said that Islam prohibited wearing pants below the ankles.

    d.  Also in 2006, Mr. Lindh was disciplined for unauthorized use of the mail after a third party forwarded him communications from another inmate.

    e.  In 2010, while in the CMU, Mr. Lindh was found guilty of refusing to obey an order after making the call to prayer in a loud voice during the 5:00 A.M. count.

    f.  In 2010, Mr. Lindh was found guilty of participating in an unauthorized meeting when he met with two other inmates in a cell to engage in congregate prayer.

    g.  In October 2011, Mr. Lindh was found guilty of being insolent to a staff member for writing a letter.

48.    BOP also employs one outside Imam to visit the CMU and lead the Friday *Jumu'ah* service once per month.

49.    H.J. Marberry, the former Complex Warden of FCC Terre Haute, did not personally see or hear:

    a.  Radical speeches being delivered to prisoners in the CMU.

    b.  Prisoners within the CMU refusing to obey staff commands during an insititional emergency.

    c.  Prisoners within the CMU refusing to stop authorized group activity during a fire emergency.

    d.  The Amir at the CMU being an alternative authority figure.

    e.  The assault that is mentioned in paragraph 18 of her previously filed declaration. [Dkt. 69-6.]

50.     Ammar Amonette, the Imam of the Islamic Center in Richmond, Virginia, has not personally seen or heard:

     a.  Muslim prisoners within the CMU being pressured to attend congregate prayer.

     b.  Any prisoner within the CMU engaging in the Adhan or call to prayer.

     c.  Muslim prisoners in the multi-purpose room in the CMU refusing to return to their cells when ordered to do so.

     d.  Muslim prisoners within the CMU attempting to recruit and train other prisoners.

51.     Leslie Smith, the Chief of the Counterterrorism Unit for the BOP, has not personally seen or heard:

     a.  Any disruptive actions by Muslim prisoners within the CMU.

     b.  Incidents where Muslims at the CMU were engaged in radicalization and/or radical action during religious services or while invoking religious themes.

     c.  Inmates at the CMU being defiant to staff authority.

     d.  Inmates at the CMU stating that they are waging war against the United States.

     e.  Prisoners at the CMU attributing their incarceration to the Unites States' "war" against Islam.

     f.  A CMU Muslim inmate engaging in inflammatory rhetoric during a *Jumu'ah* prayer inciting a disturbance on the unit.

     g.  The assault in which Brian Carr was involved as mentioned in paragraph 33 of his declaration.  [Dkt. 69-8.]

     h.  Brian Carr after the assault.

     i.  Mr. Lindh, Brian Carr, and/or Ali Asad Chandia.

The Court accepts the foregoing stipulations as its findings of fact, and enters the following additional findings:

52.     As previously determined in its Order regarding the parties' cross-motions for summary judgment, [dkt. 121], the recitation of the five daily prayers in congregation is a religious exercise rooted in Mr. Lindh's sincerely held religious belief.

53.     As stipulated by the parties, the daily congregational prayer for Muslims is either mandatory or strongly preferred.  For Mr. Lindh, it is deemed to be a mandatory religious obligation.[1]

54.     Due to the specific requirements of group prayer, the need to be aligned properly and the need to have visual or aural contact with the Imam, group prayer can only occur while Muslims are physically together and it cannot be accomplished in the CMU while the prisoners are confined separately to their individual cells.

55.     The denial of daily group prayer opportunities substantially burdens Mr. Lindh's religious beliefs as a factual matter.

56.     Daily congregate prayer for the prayers that fall during the time that the prisoners are out of their cells in the CMU occurred from the time the CMU opened in 2006 until at least November of 2009, without a serious incident other than the fire alarm in May of 2007.  The only evidence before the Court is that the prisoners did not hear the call to return to their cells on that date, and the Court deems it significant that no prisoner was penalized for failing to return. The Court therefore concludes that the May of 2007 incident is of no relevance in considering Mr. Lindh's request to allow daily congregate prayer.

---

[1] In so finding, the Court deems the testimony of Ammar Amonette irrelevant. The question under RFRA is whether the plaintiff is sincere in his professed beliefs, not whether his beliefs comport with a proferred expert's interpretation of mainstream Islamic doctrine.

57.     The Court finds it significant that, even after the daily prayers ceased in the multi-purpose room, Muslim prisoners continued to pray in small groups throughout the CMU with no incidents or disruptions.

58.     The examples of misbehavior by Mr. Lindh and Muslim prisoners in the CMU have no bearing on the issue of congregate prayer as the misbehavior, aside from two incidents where small groups of prisoners were praying together in cells in 2010, did not concern group prayer.

59.     The Court understands, and gives deference to, the articulated need of the BOP to be fair, firm, and consistent.   However, the Court finds that the congregate prayer activity that the Plaintiff seeks, which is the same congregate activity that occurred without serious incident for at least three years in the CMU, is not significantly different than any other group activity that is already allowed in the CMU.   It is not a formal service with a sermon.   It is instead a brief meeting to engage in ritualistic prayer.   It is uncontested, for example, that Muslim prisoners may gather together in the multi-purpose room, without restriction on number, to listen or watch recordings, in Arabic, of verses from the Koran.   Given that this activity is already allowed, along with a host of other congregate activities, allowing persons to recite short formulaic prayers is entirely consistent with the activities that are allowed in the CMU.   Therefore, allowing this prayer to continue does not violate the BOP's need to be fair, firm, and consistent. Moreover, it is clear that the notion that prisoners are treated in a fair, firm, and consistent way does not always mean that every prisoner is treated identically.   For example, some prisoners within the CMU have jobs, and some do not.   There is no evidence that this disparity has led to violence or any other difficulties.   Similarly, allowing a month of at least one daily congregate

prayer during Ramadan is another example of differentiated treatment.  There is no evidence that this treatment has led to resentment or problems with non-Muslim prisoners.

60.     Moreover, across the BOP it is clear that the need to be fair, firm, and consistent does not prevent special accommodations for different religions that result in, for example, certain prisoners being able to drink wine, have special diets on a daily basis as well as special regular diets, or wear special headwear or clothing consistent with their sincerely held religious beliefs.

61.     The Court acknowledges that the BOP's Program Statement regarding religious practices (Ex. 9) restricts congregate services to once a week.  However, this is no bar to allowing daily congregate prayer, even if such brief, formulaic, prayers are deemed to be "congregate services," as the Warden retains the right to modify this policy and has for the Muslim prisoners during Ramadan.

62.     The Program Statement also requires that all services be supervised by constant staff supervision if they are inmate-led.  However, the elevated audio and video surveillance within the CMU has already, during Ramadan services and during the daily prayers that inmates engaged in for several years without incident, been allowed to substitute, without incident, for constant in-person supervision.  Any daily congregate prayers can be supervised in the same manner.  The Court finds that the necessity for monitoring during Ramadan, which involves a meal, hour-long study and prayers, is greater than any need to monitor the brief, formulaic, daily prayers that are consistent with other group behavior currently allowed in the CMU. Therefore, the supervision experience during Ramadan is not analogous to that needed for the daily prayers.

63.     The Court acknowledges the concerns raised by the Warden and his witnesses regarding the security concerns if daily congregate prayers are again allowed.  However, the Court finds it

significant that the prayers occurred for a three-year period without any apparent problems or reactions from non-Muslim prisoners.  From this evidence, the Court is persuaded that the prayers may occur safely within the CMU.

64.     The Court also acknowledges the concern that the Warden expressed about allowing any type of leader to develop among prisoners.  However, insofar as this is a concern regarding prayers, the Warden can merely require, as he has already done with regard to the weekly *Jumu'ah* prayer, that the role of prayer leader rotate on a regular basis.  This concern can also be met by allowing prayers only in small groups so that no one prisoner can become a leader.  The Court finds, however, that the concerns expressed by the Warden regarding prisoner leaders are undercut by the fact that there is no prohibition on the Muslim prisoners within the CMU appointing an Amir from among themselves – in fact, staff consult with the Amir when there are problems, as well as by the fact that inmates lead both *Jumu'ah* and Ramadan services.  Those concerns are also undermined by the fact that for the more than two years that Muslim prisoners prayed in small groups following the May of 2007 incident in the multi-purpose room, there were no incidents traced to leadership issues arising from prisoners functioning as prayer leaders.

65.     Although the current warden, unlike his predecessors, did state that he reviewed alternatives to the total ban on daily group prayer, the Court finds that no attempt was made to review how group prayer is accommodated in the many BOP institutions where group prayer by Muslim prisoners has been allowed.  The Court also finds that the Warden has not made any effort to actually see a daily prayer so that he can more accurately assess how it would impact the CMU.  The Court finds, therefore, that the Warden has not adequately pursued alternatives to the total ban on daily congregate prayer.

66.    Any finding made above should be deemed to be a conclusion of law to the extent necessary.

## II.
### CONCLUSIONS OF LAW[2]

Mr. Lindh's action was brought under the Religious Freedom Restoration Act of 1993 ("RFRA"), which provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of 'general applicability'" unless it demonstrates that "the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." 42 U.S.C. § 2000bb-1.

Under RFRA, the plaintiff has the burden of persuasion of showing that a challenged practice creates a substantial burden on religious exercise, at which point the burden of persuasion shifts to the government to prove that the burden is necessitated by a compelling governmental interest and that the restriction at issue is the least restrictive means to meet that interest. *See, e.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069 (9th Cir. 2008). In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that RFRA was not a valid exercise of Congress' powers under Section 5 of the Fourteenth Amendment to enforce the substantive portions of that amendment. *Id.* at 532-35. However, this holding did not disturb the constitutionality of RFRA when addressed to the United States, as opposed to those acting under color of state law, inasmuch as "legislation affecting the internal operations of the national government does not depend on § 5 [of the Fourteenth Amendment]; it rests securely on Art. I § 8 cl. 18." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (holding that RFRA

---

[2] Any conclusion of law should be deemed a finding of fact to the extent necessary.

applies to the federal Bureau of Prisons).  Therefore, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies."  *Id.*

Congress responded to *Flores* by enacting the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  RFRA and RLUIPA are "substantively identical with respect to prisoners' entitlements."  *Whitfield v. Illinois Dep't of Corr.*, 237 Fed. Appx. 93, 94 (7th Cir. 2007).  RLUIPA applies to state and local government and to those acting under color of state law.  42 U.S.C. § 2000cc-5(4).  However, in order for RLUIPA to apply, the program or activity in question must receive federal financial assistance, affect interstate or foreign commerce, or involve land use regulations.  42 U.S.C. § 2000cc(a)(2).  Because of their substantial similarity, both RFRA and RLUIPA cases are relied on by the Court interchangeably.

### A. Does the Warden's Policy on Group Prayer Create a Substantial Burden on a Religious Exercise Motivated by Mr. Lindh's Sincerely Held Beliefs?

RFRA states that "the term 'exercise of religion' means "religious exercise, as defined in section 2000cc-5 of this title," 42 U.S.C. § 2000bb-2(4), RLUIPA.  Under RLUIPA, the term "religious exercise" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7).  The term refers not only to belief and profession but also "the performance of ... physical acts [such as] assembling with others for a worship service."  *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).  Although RLUIPA does not permit "inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  *Id.* at 725 n.13 (internal citation omitted).

### 1.  Mr. Lindh's Sincerely Held Beliefs

On summary judgment, this Court previously found "as a matter of law that daily group prayer is a religious exercise motivated by Mr. Lindh's sincerely held religious beliefs," [dkt. 121 at 10],  and entered partial summary judgment in Mr. Lindh's favor on that ground, [*id.* at 18].  The Court abides by this decision.  *See, e.g.*, *Isovolta Inc. v. ProTrans Int'l, Inc.*, 780 F. Supp. 2d 776, 779 (S.D. Ind. 2011) (recognizing that the 2010 changes to the Federal Rules of Civil Procedure contemplate that summary judgment may be entered on a part of a party's legal claim or defense).

Even if Mr. Lindh's sincerity were not already decided, the Court would conclude that he has a sincere belief in the necessity of five daily congregate prayers.  Mr. Lindh has adduced evidence of his sincerity, has continuously sought to pray in congregation, and has done so when allowed to do so in the CMU.  His belief in the necessity of group prayer is consistent with the belief of many Muslims and he is a strict adherent to Islamic law.  Although the Warden offered the testimony of Imam Ammar Amonette, who indicated that he interprets Islamic doctrine in such a manner so that there is no religious detriment to a prisoner's failure to engage in daily congregate prayer when the prison prohibits it, as the Court iterated in its findings of fact, the question under RFRA, is whether the plaintiff is sincere in his professed beliefs, not whether his beliefs comport with a proferred expert's interpretation of mainstream Islamic doctrine.  As indicated above, this Court finds that Plaintiff is sincere.  Moreover, for purposes of RFRA it is irrelevant as to whether Mr. Lindh believes that group prayer is mandated or preferred.  As indicated, RFRA protects more than mandated religious exercises: it protects all religious exercises, whether compelled by, or central to, religious belief.  42 U.S.C. § 2000cc-5(7)(A), 42 U.S.C. § 2000bb-2(4).  The group prayer is therefore a religious exercise motivated by Mr.

Lindh's sincerely held religious beliefs.

### 2. Substantial Burden

Mr. Lindh bears the burden of persuasion on the issue of whether the challenged policy "substantially burden[s]" the exercise of his religion. 42 U.S.C. § 2000bb-1(a). While RFRA does not define substantial burden, the same definition of "substantial burden" applies under RFRA, RLUIPA, and the Free Exercise Clause. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814 (8th Cir. 2008). In the context of the Free Exercise Clause, the Supreme Court has held that a government imposes a substantial burden when it "puts substantial pressure on an adherent to modify his behavior and violate his beliefs." *Thomas v. Review Bd.,* 450 U.S. 707, 718 (1981). The Seventh Circuit has recently defined a substantial burden as "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (internal citation omitted).

Given Mr. Lindh's sincere religious belief that he is required to engage in daily congregate prayer, and the Court's findings of fact regarding the Warden's current policy on group prayer, the Court concludes that Mr. Lindh is substantially burdened in his exercise of religion. Indeed, his ability to engage in daily group prayer is not only substantially burdened in the CMU, but it is absolutely prohibited. "We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise," and, therefore, prohibiting the plaintiff "from attending religious worship services substantially burden[s] his ability to exercise his religion." *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008); *see also, e.g.*, *McKinley v. Maddox*, __ Fed. App'x __, No. 11-6263, 2012 WL 3292389, at *5 (10th Cir. Aug. 14, 2012) (refusal to permit inmate to attend church services constitutes a substantial burden on his religious exercise).

18

As indicated in the findings of fact, the prayer occurring in individual cells within the CMU cannot be considered to be the group prayer that Mr. Lindh and other Muslims believe to be mandatory or strongly preferred.  In its summary judgment decision, the Court found that a genuine issue of material fact existed with respect to this issue, [dkt. 121 at 10-11], the issue only existed because it was disputed whether prisoners were able to hear and see each other from within their individual cells, and "[w]hether the prisoners are isolated or are able to see and hear each other during prayer is material to determining whether the Warden's policy has rendered Mr. Lindh's exercise of religion 'effectively impracticable,' *Koger*, 523 F.3d at 799."  [Dkt. 121 at 11.]  Between its ruling on summary judgment and the bench trial, the Court took a tour of the CMU to observe the facility first-hand and better assess the feasibility of group prayer and various areas of the CMU, including the individual cells.

At trial, the Warden appeared to abandon his earlier argument that prisoners may "collectively raise their group voices," [dkt. 116 at 2], from within their individual cells; he introduced no evidence that Muslim inmates may engage in congregate prayer while in their separate cells.  Even if he had advanced such an argument, from the Court's factual findings, the conclusion follows that prayer by individuals in separate cells does not amount to *Salat* according to Mr. Lindh's sincerely held religious beliefs: Muslims are required to be in tight rows immediately behind an Imam, which cannot occur in individual cells; Muslims must see or hear the Imam in order to follow him, which the facts demonstrate is impossible in the CMU; and all Muslims engaging in the congregate prayer must face Mecca, whereas there is no guarantee in the CMU that Muslim inmates will even be celled next to other Muslims, and certainly no guarantee that the Imam will be between Muslim inmates and Mecca so that he is in

19

front of them during the prayer.

The Warden has argued that Mr. Lindh's religious exercise is not substantially burdened insofar as he may practice his faith in ways unrelated to congregate prayer, such as by using a prayer rug, wearing a kufi, or praying individually.  The fact that Mr. Lindh is allowed to pray in his cell and to practice his Muslim faith in other ways within the CMU does not alter the fact that this rights under RFRA are being violated by the Warden's failure to allow congregate prayer. "[P]laintiff's ability to practice his faith by means other than group prayer is irrelevant to the question whether his ability to freely exercise his beliefs was substantially burdened."  *Meyer v. Teslik*, 411 F. Supp. 2d 983, 989 (W.D. Wis. 2006).  This is because, "[u]nlike the First Amendment, RLUIPA protects more than the right to practice one's faith; it protects the right to engage in specific, meaningful acts of religious expression in the absence of a compelling reason to limit expression."  *Id.*  This applies under RFRA as well.  And, as the *Meyer* court noted in language apposite to this action, "[i]t is difficult to imagine a burden more substantial than banning an individual from engaging in a specific religious practice."  *Id.*

As stated above, the Court has found that group prayer can only occur while Muslims are physically together.  By prohibiting Mr. Lindh and the other Muslim prisoners who hold similar beliefs in the CMU from praying in each other's presence, the Warden has denied Mr. Lindh and these other prisoners the religious exercise of daily group prayer.  This religious exercise is rooted in Mr. Lindh's sincere religious belief, and it is substantially burdened inasmuch as the Warden has rendered group prayer impossible, not just "effectively impracticable."  *Koger*, 523 F.3d at 799.

**B. Is the Warden's Policy on Group Prayer the Least Restrictive Means of Achieving a Compelling Governmental Interest?**

Because the denial of group prayer substantially burdens Mr. Lindh's sincere religious belief, Mr. Lindh is entitled to judgment unless the Warden carries his burden of demonstrating both that this substantial burden furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b). The Warden has not demonstrated either that the ban on group prayer actually furthers a compelling governmental interest or that it is the least restrictive means of furthering that interest.

**1. Compelling Governmental Interest**

The Warden has argued that the ban on group prayer furthers the compelling governmental interest in prison security. It is undisputed that institutional security is "the most compelling governmental interest in a prison." *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996). Indeed, the legislative history of RFRA demands that courts enforcing the statute give due deference to prison officials on issues of prison security and discipline. *Mack v. O'Leary*, 80 F.3d 1175, 1190 (7th Cir. 1996) (citing H. Rep. No. 88, 103d Cong., 1st Sess. 8 (1993); S. Rep. No. 11, 103d Cong., 1st Sess. 10, U.S. Code Cong. & Admin. News 1993 p. 1900). *See also Cutter*, 544 U.S. at 723 (noting Congress' intent that courts show "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.").

However, the Court must not blindly defer to the Warden's position on matters that implicate prison security, and "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalization will not suffice to meet the

21

act's requirements."   S.Rep. No. 103-11, 1993 U.S. Code Cong. & Admin. News at 1900. Although the Warden undoubtedly has a compelling interest in maintaining prison security, he still bears the burden of demonstrating that his policy on group prayer actually serves to further the security interest.   42 U.S.C. § 2000bb-1(b)(1).   He has not satisfied that burden here.

At trial, the Warden advanced several specific reasons that he believes the complete ban on congregate daily prayer advances the compelling interest in prison security.   The Court will address each in turn.

First, the Warden argues that prison policies must be "firm, fair, and consistent." However, RFRA recognizes that religions have differing requirements and requires that these individual requirements be accommodated to the extent practicable.   Existing BOP policy already affords special religious diets to Jewish inmates, a special prayer location to Native American inmates, and the opportunity to engage in varying activities related to each religion's high holy period.   Permitting inmates of all religions to pray non-disruptively in small groups at times that they are allowed to roam the CMU and participate in other small group activities, such as reading, playing cards, watching religious DVDs, or engaging in conversation, would be harmonious with a "firm, fair, and consistent" policy.

Second, the Warden argues that any grouping of inmates naturally poses a security risk and must take place in locations designated for the activity, specifically the multi-purpose room for religious services.[3]   The CMU is unique among BOP facilities insofar as it is extensively monitored by audio and by video.   The Warden's contention that group prayer poses an

---

[3] The Court does not find that the multi-purpose is the only location in which congregate prayer can occur.   At the outset of the litigation, the Warden successfully opposed class certification challenging Plaintiff's ability to meet the numerosity requirement, and arguing there were too few inmates seeking congregate prayer to warrant class treatment.

unacceptable security risk is undermined by evidence that inmates have prayed in small groups throughout the CMU and at other BOP institutions without incident.   Furthermore, Chief Chaplain Michael Smith's affirmative response as to whether chapels at other facilities, including high-security institutions, were "left open to inmates to walk in and engage in religious activities during times when there was no other formal programming," [dkt. 188 at 246], is persuasive evidence that a policy of allowing self-directed, additional religious exercises is not problematic or threatening to prison security.

Third, the Warden expresses concern about any sort of group activity where there is a leadership structure.   This concern rings hollow, however, in light of the fact that the BOP is made aware of which inmate is the present Amir in the Muslim community at the CMU, staff speak with that individual about any problems that might arise, and staff does not discipline or prohibit the Amir position.   Moreover, Muslim inmates already typically lead the *Jumu'ah* service, where they have an opportunity to give a sermon, as well as the Ramadan services within the CMU, and a leadership structure is less likely to arise in the context of formulaic prayers than it is when inmates are giving sermons.   The Warden has already taken measures to avoid potential leadership struggles by requiring that the Amir position be rotated regularly, and he can require inmates to rotate leading daily prayers in the same manner.

Fourth, the Warden contends that all inmate-led services must be supervised.   Again, this concern rings hollow in light of the fact that there is often no in-person supervision of the inmate-led Ramadan services within the CMU.   Moreover, unlike the other BOP facilities where prayer occurs throughout units, the CMU is extensively monitored and the staff-to-inmate ratio is far greater.   Chaplain Holston testified that surveillance by audio and visual devices is in fact

used in another part of the Terre Haute institution as a substitute for in-person supervision. The Warden has not established why it is more necessary for direct in-person supervision of small, formulaic group prayers than for groupings of inmates watching Koranic verses on television, playing cards, or engaging in other conversations. And, the evidence establishes that, while no disruptive episodes have occurred in the CMU as a result of small group prayers, a fight has occurred over a remote control and one has occurred when the victim was reading.

Fifth, the Warden argues that permitting daily congregate prayer in the CMU in Terre Haute may negatively impact the other CMU in Illinois because congregate prayers are not permitted in that location. Initially, the Warden presented no evidence concerning whether small group prayers have occurred informally in the other CMU in the same manner that they have occurred in Terre Haute, and his witnesses therefore were only describing the formal policy of that CMU. Additionally, while this case only concerns the CMU in Terre Haute, this Court cannot find that the prohibition on daily congregate prayer is justified by the fact that daily prayer is not permitted elsewhere. This is especially true given the undisputed fact that daily prayer does occur in other BOP facilities.

Finally, the Warden briefly addressed the impact of permitting small groups of Muslim inmates to pray together in a cell. The Warden contends that this would threaten security insofar as, when multiple inmates are in a cell, "you don't know what they are doing in there" and "bad things can happen" such as "drug use, homosexual activity, fights, homicides." [Dkt. 192 at 183-184.] However, this ignores the fact that the Warden does permit inmates to visit each other's cells, and this explanation therefore cannot be said to advance prison security.

RFRA requires that the Warden "must do more than merely assert a security concern."

*Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 988 (8th Cir. 2004).  However, the evidence presented by the Warden is an assertion of security concerns without corresponding evidence to support the concern. Mr. Lindh is a low-security prisoner who wishes to engage in a brief communal activity with other prisoners during the time that prisoners in the unit are allowed to engage in a host of communal activities.  The desired activity, daily group prayer, is one that Mr. Lindh and the other prisoners previously engaged in with no additional security problems or concerns.  Furthermore, there is no credible factual evidence to support the Warden's argument that the resumption of prayer in a unit that is open and extensively monitored via visual and audio observance of all prisoners, will cause additional security concerns different than that posed by communal activities currently allowed on the unit.  The Warden therefore has failed in his burden to establish that his group prayer ban actually furthers the compelling interest of prison security.

### 2.  Least Restrictive Means

In addition to establishing that the ban on group prayer actually furthers the compelling interest of security, to prevail the Warden must also establish that the ban is the least restrictive means of furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1(b)(2).  The Warden has failed to establish that the total ban on daily congregate prayer by Mr. Lindh and other Muslim prisoners within the CMU is the least restrictive means of meeting the Warden's security concerns.

"In determining the least restrictive means, 'the Government must consider and reject other means before it can conclude that the policy chosen is the least restrictive means.'" *Williams v. Secretary Pennsylvania Dep't of Corrections,* 450 Fed. App'x 191, 195 (3d Cir. 2011) (quoting *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007)); *see also, e.g., Shakur v.*

25

*Schirro*, 514 F.3d 878, 890 (9th Cir. 2008) ("[A] prison 'cannot meet its burden to prove least restrictive alternative unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'") (internal citation omitted).  The Warden has failed to legitimately consider alternatives to the total ban on daily congregate prayer by Muslim prisoners within the CMU.  While it is true that Warden Oliver testified that he considered alternatives, [dkt. 192 at 186-187], he did so long after the ban on daily group prayer was implemented and without ever having seen a Muslim prayer other than the *Jumu'ah* prayer, [*id.* at 172].  He expressed concern that allowing any prayer would not be "firm, fair, and consistent"; however, merely articulating this concern is not a substitute to considering alternatives to a complete ban on the congregate daily prayer.  Warden Oliver's considerations therefore are more akin to "post-hoc rationalizations" than they are to the sincere consideration of less restrictive alternatives.  Accordingly, the Court cannot conclude that he legitimately considered alternatives to the total ban on daily congregate prayer.

The consideration of less restrictive alternatives by Warden Jett and Warden Lockett is similarly problematic.  Warden Jett, who first instituted the ban on congregate daily prayer, testified that the only alternatives he considered were permitting inmates to pray in their cells or to pray while walking.  [Dkt. 192 at 133.]  However, it is undisputed that neither praying individually in a cell nor praying while walking meets the requirements for Muslim congregate daily prayer; accordingly, these options cannot be considered less restrictive alternatives to a complete ban on group prayer.  Similarly, Warden Lockett testified that the only alternative he considered was permitting additional prayer times during the holy month of Ramadan.  [Dkt. 192 at 105, 107.]  He also testified that permitting additional accommodations during each religion's

"high holy period," such as Ramadan or Christmas, was a part of pre-existing BOP policy, [*id.* at 105]. Warden Lockett's testimony concerning the consideration of less restrictive alternatives to a complete ban on congregate daily prayer is therefore not a legitimate consideration of alternative but rather a description of other religious accommodations in existence. As indicated above, the various other religious accommodations offered to Muslims are irrelevant to the legality of the ban at issue in this case. The Court therefore concludes that the Warden did not adequately consider any alternatives to the ban at issue.

While under RFRA, it is not the responsibility of the plaintiff to suggest alternatives, Mr. Lindh has noted that if the multi-purpose room is not available for daily prayer, prayers may continue, as before, in smaller groups throughout the unit. In determining whether there are less restrictive measures to the total ban, it is relevant that prisoners in other Bureau of Prison institutions are allowed to pray together for the daily prayers, in addition to the *Jumu'ah* Friday prayer. The fact that daily prayer can be accommodated in other institutions within the Bureau of Prisons demonstrates that there are other alternatives that should have been considered by the Warden here. As Judge Hamilton noted in a case finding the refusal of the Indiana Department of Correction to allow communal worship by Odinist prisoners to be unlawful under RLUIPA, "[t]he fact that other prison systems permit Odinists to worship collectively is persuasive evidence that it should be possible to find a solution that effectively balances prisons' important security concerns with inmates' right to be free from substantial burdens on their free exercise of religion." *Hummel v. Donahue*, 2008 WL 2518268, at *8 (S.D. Ind. 2008). This Court likewise finds the fact that daily prayer can be accommodated in other BOP institutions persuasive evidence that it should be possible to craft a less restrictive policy for the CMU than a total ban

27

on group prayer.

In sum, Mr. Lindh has demonstrated that his rights under RFRA are violated by the CMU's total ban on daily group prayer, and the Warden has failed to establish either that the ban is justified by a compelling interest or that it is the least restrictive means to further a compelling governmental interest.  Mr. Lindh is therefore entitled to appropriate relief.

### C. What Relief Should Be Granted to Mr. Lindh Under the Prison Litigation Reform Act?

RFRA provides that a "person whose religious exercise has been burdened in violation of this section may assert that violation as a claim . . . in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000b-1.  The relief that may be awarded to a prisoner when federal law is violated is constrained by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, *et seq.*, which provides that, in litigation brought by a prisoner concerning prison conditions, a court

> shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).  The PLRA defines prospective relief as "all relief other than compensatory monetary damages."  18 U.S.C. § 3626(g)(7).

As detailed above, a "federal right," established by RFRA, has been violated here.  Mr. Lindh is therefore entitled to declaratory relief that the ban on daily congregate prayer imposed by the Warden violates RFRA.  The declaratory judgment will not in any way be intrusive nor will it negatively impact public safety.  Moreover, the U.S. Supreme Court has recently stressed that the PLRA does not prevent orders that have an impact on the public.  *See Brown v. Plata*, __

U.S. __, 131 S.Ct. 1910, 1941 (2011).

Furthermore, the Court finds that as a component of narrowly drawn relief that goes no further than necessary to correct the violation of RFRA, it is both appropriate and necessary to enter a permanent injunction requiring the Warden to employ a less restrictive alternative to his total ban on group prayer.  A plaintiff must satisfy a four-factor test before the Court can grant a permanent injunction: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Here, Mr. Lindh is being caused irreparable harm for which there is no adequate remedy at law.  *See Hummel*, 2008 WL 2518268, at *8 ("[I]rreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion …." (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996))).  Furthermore, the balance of hardships also weighs in Mr. Lindh's favor because while the Warden may further his goal of maintaining safety through less restrictive means, Mr. Lindh "has no other way to practice his religion with others."  *Id*.  Because the Warden may maintain a safe and orderly prison while permitting Mr. Lindh to engage in group prayer, the public interest would not be disserved by a permanent injunction.  The Court therefore grants Mr. Lindh's motion for a permanent injunction.

### III.
### CONCLUSION

In passing the Religious Freedom and Restoration Act, the United States Congress restricted the ability of federal prison wardens to substantially burden the sincerely held religious

beliefs of inmates.  Such burdens can only be imposed to further a compelling governmental

interest, and by use of the least restrictive means.  Throughout this action, the Warden has argued

for deference to his decisions, yet he has not given appropriate deference to the standard imposed

by Congress.  Accordingly, the Court finds that the Warden's policy prohibiting daily group

prayer by Muslim inmates violates RFRA.  The Warden will have 60 days in which to employ a

new policy with respect to daily group prayer for Muslims.  The Court is issuing today a

permanent injunction to take effect in 60 days.


01/11/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only:**

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

William Lance McCoskey
UNITED STATES ATTORNEY'S OFFICE
william.mccoskey@usdoj.gov